IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| J. LESTER ALEXANDER, III, | ) |
| Trustee for Terry Manufacturing | ) |
| Co., Inc. And Terry Uniform | ) |
| Co., LLC, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| vs. | ) AP No. 04-03072 |
| | ) |
| BONIFAY MANUFACTURING, INC., | ) |
| | ) |
|     Defendant. | ) |

Montgomery, AL
April 18, 2005, 1:34 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Mr. Brent B. Barriere
Phelps Dunbar, LP
365 Canal St., Suite 2000
One Canal Place
New Orleans, LA 70130

Mr. Collier H. Espy, Jr.
Espy, Metcalf & Poston, PC
P.O. Drawer 6504
Dothan, AL 36302-6504

Electronic Recorder
Operator:                        Linda Bodden

Transcriber:                     Patricia Basham
6411 Quail Ridge Drive
Bartlett, TN  38135
9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.



2

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| J. Lester Alexander | 8 | 25 | -- | -- |
| Terry Price | 29 | 48 | 54 | -- |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|---|---|---|---|
| 1 | Plaintiff's:<br>1066 Summary | 5 | 5 |
| 2 | Alexander's Expert Report | 24 | 24 |
| 3 | 1/9/03 Letter | 24 | 24 |
| 1 | Defendant's:<br>Checks received during ninety-day period prior to bankruptcy | 34 | 39 |
| 2 | Checks received during period beginning July '02 to preference period | 35 | 39 |
| 3 | Invoices | 36 | 39 |
| 4 | Aging Report | 37 | 39 |
| 6 | Invoices from 4-8-03 to 7-1-03 | 45 | 48 |

3

1          (CALL TO ORDER)

2          THE COURT: Please be seated.

3          COUNSEL: Good afternoon, Judge.

4          THE COURT: Good afternoon.  Let's go ahead and we will

5     take appearances, starting on my left.

6          MR. BARRIERE: Thank you, Your Honor.  Brent Barriere

7     for J. Lester Alexander, III, trustee and plaintiff in this

8     matter.

9          MR.  ESPY:  Collier  Espy,  attorney  for  Bonifay

10    Manufacturing Company, the defendant.

11         THE COURT: All right.  Good afternoon.

12         MR.  BARRIERE:  Your Honor, this is a trial on the

13    merits of an adversary proceeding brought by Mr. Alexander as

14    Chapter 7 Trustee of Terry Manufacturing seeking to recover

15    preference payments exceeding a hundred and seven thousand

16    dollars.

17         Your Honor, in order to expedite today's proceeding I

18    propose to begin today by reading into the record stipulations

19    the parties previously reached and providing to the court a

20    summary  concerning  the  payments  which  I  believe  should

21    significantly streamline the court's consideration of this

22    matter if that is acceptable to the court.

23         THE COURT: Okay.  Let's see.  Is this stipulation

24    already in the record or -

25         MR. BARRIERE: It is, Your Honor.  It is actually in

4

1    the pretrial order.

2          THE COURT: Okay. Yeah, I am with you now. I have got

3    them right here.

4          MR. BARRIERE: All right. The stipulated facts appear

5    starting on page two, Your Honor.

6          THE COURT: I have got them. Okay. All right. So we

7    have just got, starting at page two –

8          MR. BARRIERE: Roman Numeral paragraph four.

9          THE COURT: Yeah. Paragraph four and then I will

10   simply accept the stipulation and I will find those facts as

11   stipulated.

12         MR. BARRIERE: Very well, Your Honor. And if the court

13   doesn't want me to take the time to read them back into the

14   record, that is fine. It is your preference.

15         THE COURT: No, I don't think we need that. I see we

16   have got a number of payments were made. Let me get – now is

17   this like in the ordinary course of business? Is that what is

18   in issue or what do we have left to try?

19         MR. BARRIERE: If I could just finish and I will turn

20   the dais over to Mr. Espy. First if I could approach here,

21   Your Honor, here is a stipulated exhibit that I will be

22   offering.

23         THE COURT: Thank you.

24         MR. BARRIERE: I will be marking this as Plaintiff's

25   No. 1. Mr. Espy and I have agreed to the introduction. This

5

1   is a 1066 summary which lays out the amount of each of the
2   checks paid to Bonifay Manufacturing by Terry, the related
3   invoices, the relevant dates of payment, the dates of the
4   invoices, the dates by which the invoices were past-due.

5          THE COURT: Okay.

6          MR. BARRIERE: Your Honor, I believe on the basis of
7   that document which I will at this time mark, offer and
8   introduce as Plaintiff's No. 1, we find ourselves in the
9   following position: As the court is aware, there are five
10  elements that fall within the trustee/plaintiff's burden of
11  proof. First, that the transfer is made for the benefit of the
12  creditors. Plainly we have that satisfied here. The payments
13  were to Bonifay.

14         The transfer must have been on account of an
15  antecedent debt. As this and the stipulations of the record
16  reflect, these were in payment of antecedent debts.

17         The transfer must have been made while the debtor was
18  insolvent. We have not had a challenge to the 547(f)
19  presumption of insolvency, though Mr. Alexander will briefly
20  address that when he takes the stand.

21         The transfers must have been made within ninety days
22  of the Chapter 11 filing. That is reflected in the stipulation
23  and the Exhibit No. 1. And the transfer has permitted the
24  recipient to receive more than he would if the case had
25  originally been filed as a Chapter 7, which Mr. Alexander will

1    address.

2         We believe that testimony will be fairly brief.  The
3    defendant has raised an ordinary course of business defense and
4    a new value, contemporaneous new value defense.   We will
5    probably leave that until rebuttal testimony but I think those
6    are the areas that remain outstanding.

7              THE COURT: Okay.  Mr. Espy.

8              MR. ESPY: Yes, sir, Your Honor.  I believe Mr.
9    Barriere has succinctly put where we are in that the payments
10   were made when they were made.  We had one issue about the very
11   earliest payment.   It was actually received by my client
12   outside the ninety days but it appears it did not clear the
13   debtor's account until within the ninety days.  We have raised
14   that but I believe there is a Supreme Court case on point, and
15   that is just a fact.  It was presented and it posted whenever
16   it did.

17             Other than that, we desire to show to the court the
18   longstanding relationship between Bonifay Manufacturing and
19   Terry Manufacturing going back about seventeen years and that
20   historically these payments were late.   They were always
21   outside the stated invoice date of within thirty days.   But
22   that was what we contend became an ordinary course of business
23   between this defendant, Bonifay Manufacturing, and Terry
24   Manufacturing.  And in our pretrial statement we have submitted
25   court cases where some courts have held you can look at the

7

1    relationship on that issue.

2              And then after the testimony and Your Honor takes this

3    under advisement, if you do not find it was ordinary course of

4    business, we contend that within the ninety days before filing,

5    Bonifay without pressure, without threat, continued to ship

6    goods  to  Terry  Manufacturing  to  the  tune  of  sixty-three

7    thousand dollars which created inventory that we contend was

8    subsequently sold that created value for this estate.  We have

9    not been paid for those.  They were, we contend, new value.

10             That again would be a secondary issue if you find that

11   we did not have an ordinary course of business relationship.

12             THE  COURT:  Okay.   Now for your ordinary course of

13   business, are you going to offer testimony from –

14             MR. ESPY: The president of the company, Your Honor.

15             THE  COURT:  Okay.   Is there going to be any other

16   evidence as far as what might be standard in the industry or

17   are we going to look just – in other words, are we going to

18   look just to the relationship between the debtor corporation

19   and your client who I take it was a supplier of some kind –

20             MR. ESPY: Yes, sir.

21             THE  COURT:  Are  we  going to  look  just  to  that

22   relationship or are we going to look to see how we look at the

23   industry as a whole and see what is ordinary in the industry?

24   That is one thing that I have always been a little bit unclear

25   about.

1        MR. ESPY: Well, Your Honor, I would expect the

2    evidence to show that the industry standard would be ordinary

3    invoicing, payment within thirty days.  Beyond that, finance

4    charges were due.  So I would expect that Mr. Barriere will

5    solicit that and my client will stipulate that was the normal

6    invoicing.  But this customer and one other, we contend, had a

7    longstanding relationship and we believe that this does allow

8    for you to consider an exception to the industry standard based

9    on a particular relationship.  So we are going to ask you to

10   look at that aspect.

11        THE COURT: Okay.  Thank you.  Mr. Barriere.

12        MR. BARRIERE: Your Honor, I would call J. Lester

13   Alexander to the stand as my first and only witness.

14        THE COURT: All right.

15        (J. LESTER ALEXANDER, WITNESS, SWORN)

16                    DIRECT EXAMINATION

17   BY MR. BARRIERE:

18   Q.      Good afternoon, Mr. Alexander.  Would you state your

19   full name for the record, please?

20   A.      It is Julian Lester Alexander, III.

21   Q.      And by whom are you employed, sir?

22   A.      AEA Group, LLC.

23   Q.      And what is your position with the AEA Group?

24   A.      I am the president of the company.

25   Q.      All right.  Have you acted as the trustee in the

Alexander - Direct                    9

1    Terry Manufacturing case since approximately early July of

2    2003?

3    A.        Yes, I have.

4    Q.        All right.   Can you describe for the court the

5    condition of the books and records of Terry Manufacturing at

6    the time you assumed your duties as trustee?

7    A.        When I arrived on the first day on Friday, we found

8    the offices in total disarray, file cabinets empty, the

9    contents strewn on the floor.   We were never able to locate

10   records like general ledgers, accounts payable ledgers or

11   anything like that.

12   Q.        To your knowledge did those records ever exist?

13   A.        We did look on the hard drives forensically on the

14   computers and were never able to determine whether those

15   records did or did not exist.

16   Q.        Did you determine that certain computer records had

17   either been removed, deleted or simply taken physically?

18   A.        Yeah, there was more than ten personal computers were

19   acquired shortly before my arrival and it was reported by

20   employees that those were removed just prior to my arrival.

21   Q.        Now subsequent to your appointment as trustee did you

22   or persons working at your direction attempt to reconstruct

23   financial records of Terry Manufacturing?

24   A.        Yes, we did.

25   Q.        Can you describe for the court generally the source

1    of reconstruction you have been able to conduct over the past,

2    oh, now, sixteen months, eighteen months?

3    A.        We principally had to go to banks and get bank

4    statements as well as enclosures produced to us from the banks

5    and, using cash transactions, we rebuilt the records.  We also

6    were able to use legal documents that were recovered from the

7    site and other information to rebuild the records.

8    Q.        Now I want to focus specifically on what efforts, if

9    any, you may have taken to analyze the type and value of assets

10   and type and amount of liabilities of Terry Manufacturing at

11   the time of this Chapter 11 filing in July of 2003.  Did you

12   conduct such an analysis?

13   A.        Yes.

14   Q.        Can you describe to the court generally what you did

15   in that regard?

16   A.        Well, initially we went and inventoried the assets

17   that we could locate.  We were a little bit handicapped because

18   we didn't have traditional records like fixed asset listings or

19   inventory listings, but we made inventories and then we also

20   brought other business people who may have been interested in

21   acquiring the assets and they assisted us also in pegging

22   values.

23   Q.        And that was on the asset side of the ledger.  What

24   did you attempt to do with respect to the liability side of the

25   ledger?

Alexander - Direct                    11

1    A.        The liability side of the ledger, when we rebuilt the

2    balance sheets, was based on a combination of the income tax

3    returns that were actually filed with the government and the

4    claims register that exists in this case.

5    Q.        Did you determine that there were multiple sets of

6    income tax returns maintained by Terry Manufacturing?

7    A.        Yes.

8    Q.        Can you describe to the court what you found in that

9    regard?

10   A.        Well, there was one set of tax returns that were

11   provided to stake holders, banks and investors reflecting

12   profits.  They could be reconciled to the financial statements

13   that were supposedly audited that had also been provided to

14   those.  And then we found penciled copies of a different set of

15   tax returns that reflected losses, so we contacted the IRS and

16   they confirmed that a different set of returns was filed and it

17   did agree to the penciled set that we recovered reflecting

18   losses.

19   Q.        All right.  So you had a set to provide to investors

20   and banks that showed making money and you had another set

21   actually filed with the IRS that reflected the opposite?

22   A.        That's correct.

23   Q.        All right.  Were you able to, based upon that work,

24   quantify the amount of the liabilities as of the filing date in

25   early July of 2003?

1    A.        Yes.

2    Q.        And were you able to determine whether the company

3    was solvent as of the filing date in July of 2003?

4    A.        Yes.

5    Q.        And what did you conclude in that regard?

6    A.        As of the filing, the liabilities, the fair value of

7    the liabilities exceeded the fair value of the assets by sixty-

8    three point nine million dollars.

9    Q.        All right.  Now I want to take you back to earlier in

10   the year of 2003.  Were you able to determine the net worth of

11   this company as of year-end 2002 or January 1, 2003?

12   A.        Yes.

13   Q.        And what did you conclude in that regard?

14   A.        As of December 31, 2002, the fair value of the

15   liabilities exceeded the fair value of assets by fifty-eight

16   point eight million.

17   Q.        All right.  And was that reflected on the financial

18   statements provided to banks, investors and other parties?

19   A.        No.

20   Q.        What did those records reflect?

21   A.        The historical financial statements provided to banks

22   and investors, it is my recollection showed - it showed a

23   positive equity, Your Honor.  I just can't remember at this

24   date what it was but it reflected them being solvent.

25   Q.        All right.  Mr. Alexander, accept for purposes of my

1    question that the ninety-day preference period commenced on or

2    about April 7 of 2003. Have you attempted to determine whether

3    the company was or was not solvent as of that date?

4    A.        Yes, I have.

5    Q.        And what conclusion did you reach in that regard?

6    A.        It was a little bit more difficult because we didn't

7    have snapshots including tax returns and other records but, if

8    you look at the cash flows running through the bank accounts

9    and you look at the number of debts that weren't paid, it is

10   clear that they did not have sufficient cash flow to pay their

11   debts.   In fact, their situation worsened in that period of

12   time.

13   Q.        Would it be your judgment that the negative net worth

14   of fifty-eight point eight million dollars had worsened as of

15   April 7 of 2003?

16   A.        Yes, absolutely.

17   Q.        Now in the course of your duties as trustee and in

18   analyzing the liabilities of this company, have you become

19   familiar with the amount of indebtedness secured by various

20   collateral and other property owned by Terry Manufacturing?

21   A.        Yes, I have.

22   Q.        All right. And you are generally familiar with the

23   amount of secured debt in this case?

24   A.        I am generally familiar with the amount of secured

25   debt.

1    Q.       All right.  And you are generally familiar with the

2    amount of the unsecured debt also?

3    A.       Yes.

4    Q.       All right.  Have you attempted to analyze what, if

5    any, distribution would have been made to unsecured creditors

6    if the Terry Manufacturing case had originally been filed as a

7    Chapter 7 case?

8    A.       Yes.

9    Q.       And what have you concluded in that regard?

10   A.       There would not have been a distribution to the

11   unsecured creditors.

12   Q.       And on what do you base that conclusion?

13   A.       Because the secured debt was far in excess of the

14   assets available and they were substantially all pledged

15   against that secured debt.

16   Q.       All right.  I have heard in this courtroom claims of

17   secured debt in the range of twenty million dollars.  Is that

18   consistent with your understanding?

19   A.       Yes.

20   Q.       And do you have a judgment as to whether the asset

21   securing that debt, which you described as substantially all of

22   the assets of Terry Manufacturing, have a value equal to or

23   greater than twenty million?

24   A.       I do have a judgment.

25   Q.       And what is that, sir?

1    A.        It is far less than twenty million.

2    Q.        So it would be your testimony, I take it, then, that

3    secured creditors not only would consume all of the assets but

4    in fact would be left with a significant under secured claim?

5    A.        Yes.

6    Q.        All right.

7              MR. BARRIERE: Now, Your Honor, for the next portion

8    of Mr. Alexander's testimony, I will initially need to qualify

9    him as an expert Certified Public Accountant and Certified

10   Fraud Examiner unless you want to stipulate to that.

11             MR. ESPY: I will stipulate.

12             MR. BARRIERE: All right.

13   Q.        Mr. Alexander, you are a CPA; are you not, sir?

14   A.        Yes, I am.

15   Q.        And you have been certified in the state of Alabama

16   for some number of years?

17   A.        Yes, I have.

18   Q.        How long is that, sir?

19   A.        I was originally certified in the state of Florida in

20   1980 and then I believe in 1981 I was granted my first license

21   in Alabama.

22   Q.        All right.  And do you remain a Certified Public

23   Accountant as of this date?

24   A.        I do.

25   Q.        Are you a Certified Fraud Examiner?

Alexander - Direct                    16

1    A.       Yes, I am.

2    Q.       And how long have you had that distinction?

3    A.       Since the early nineties.

4    Q.       Are you certified in any other area?

5    A.       No.

6    Q.       All right. As a Certified Public Accountant, did you

7    have an occasion during your practice to conduct public audits

8    or audits of companies whether public or private?

9    A.       Yes.

10   Q.       Over what period of time have you conducted audit

11   work?

12   A.       From the beginning of my career in 1978, I was

13   essentially a full-time auditor through 1993 and then continued

14   to audit all the way up until the year 2001 to some degree.

15   Q.       All right. Can you give the court an estimate of the

16   number of audits you have conducted during the course of your

17   career?

18   A.       Dozens of audits.

19   Q.       All right. As part of your audit practice, were you

20   required to evaluate the aging of accounts receivable and

21   accounts payable of the clients subject to the audit?

22   A.       Yes. That's a normal and customary duty of an

23   auditor.

24   Q.       As part of that audit process would you compare the

25   accounts receivable aging and aging of the payables of the

Alexander - Direct                    17

1    client to those for the industry in which it is acting?

2    A.        You would in virtually every audit compare your

3    accounts receivable aging to industry standards and then, in

4    the troubled company audits, you would also compare accounts

5    payable agings to industry standards.

6    Q.        Can you describe to the court the procedure you would

7    do for - you employ, rather, for conducting that comparison?

8    A.        Well, there are several research companies that exist

9    that aggregate data by industry code, standard industry code,

10   and typically CPA's would seek that information as one

11   benchmark of industry aging.

12   Q.        All right.  Mr. Alexander, did you offer and execute

13   an expert report in this case?

14   A.        I did.

15   Q.        Is that a copy before you, sir?

16   A.        Yes, it is.

17   Q.        Mr. Alexander, as part of the issues addressed in

18   that report, did you ask to consider the typical terms for

19   payment of invoices issued by Bonifay Manufacturing to Terry

20   Manufacturing?

21   A.        Yes.

22   Q.        And what did you conclude in that regard?

23   A.        Well, coming up with typical was rather hard to do.

24   They actually paid consistently late as compared to their

25   terms. Their normal terms as is stipulated were thirty days and

1    then there was a finance charge added if it was late and Terry

2    Manufacturing did pay that finance charge.

3    Q.        All right.  Just so I understand, did the invoices

4    themselves call for payment within thirty days, net thirty

5    days?

6    A.        Yes, the standard terms on each invoice was thirty

7    days.

8    Q.        And finance charges were due and payable after thirty

9    days?

10   A.        That's correct.

11   Q.        And how were those calculated?

12   A.        Based on the amount of outstanding payments and the

13   days, I believe.

14   Q.        All right.  Did you determine whether Terry

15   Manufacturing in fact received invoices for finance charges for

16   past-due amounts?

17   A.        I did.

18   Q.        Did you determine whether Terry Manufacturing had in

19   fact paid invoices for finance charges?

20   A.        Yes.

21   Q.        It had?

22   A.        They have.  It was actually during the preference

23   period there were three payments that were for finance charges.

24   Q.        All right.  Now you testified a moment ago that the

25   contract - the invoices call for thirty days but you also

1    determined that Terry consistently paid or often paid beyond

2    thirty days; is that correct?

3    A.        That's correct.

4    Q.        All right.    Now during the course of your

5    investigation did you determine that Bonifay attempted to

6    reduce the outstanding days between issuance of invoice and

7    payment by Terry Manufacturing?

8    A.        I did determine that, yes.

9    Q.        Mr. Alexander, I am handing you a letter dated

10   January 9, 2003, issued by Bonifay Manufacturing under the

11   signature of Terry Price to Terry Manufacturing Company.    Did

12   you find this letter among the documents you could uncover at

13   Terry Manufacturing?

14   A.        I do not believe we found this letter in the

15   documents at Terry Manufacturing.

16   Q.        This was produced during the course of discovery in

17   this case?

18   A.        That's correct, by Bonifay.

19   Q.        All right.    And can you summarize what was being

20   conveyed by this correspondence?

21   A.        Well, generally speaking, Bonifay was –

22            MR. ESPY: Your Honor, I would object to what he would

23   summarize.    I mean the letter will speak for itself.

24            THE COURT: Sustained.

25            MR. BARRIERE: All right.

1    Q.        Let me come at it a different way, sir.  The letter

2    contemplates that Terry Manufacturing will begin making

3    payments on an accelerated basis, twenty-one thousand dollars

4    per week.  Are you aware of that, sir?

5    A.        Yes.

6    Q.        Did you determine that in fact Terry Manufacturing

7    did that for some period of time?

8    A.        Yes.

9    Q.        All right.  And how did you make that determination?

10   A.        From their bank records.

11   Q.        All right.  So do you recall over what approximate

12   period of time Terry Manufacturing ceased its formal practice

13   of payments of individual invoices and then began paying in

14   lump sums of twenty-one thousand dollars per week?

15   A.        Not precisely but it is my recollection it was for

16   about a two-month period of time.

17   Q.        All right.  And that continued up until about the

18   beginning of the preference period; is that correct?

19   A.        That's my recollection, yes.

20   Q.        Given all of that, were you able to come to any

21   conclusion as to what was the typical practice between Bonifay

22   and Terry Manufacturing with respect to the payment of

23   invoices?

24   A.        Yes, I do have an opinion about that.

25   Q.        Could you state that for the court, please?

1    A.         That there really was no typical practice during the

2    time frame approaching the ninety-day period as well as during

3    the ninety-day period.

4    Q.         All right.  You told us earlier that you, as part of

5    your auditing practice, would routinely look to independent

6    guides or research with respect to what is the norm for payment

7    of accounts payable/receivable in a given industry; is that

8    correct?

9    A.         That is correct.

10   Q.         All right.  Now, as part of your engagement and your

11   work in this case, did you attempt to do that with respect to

12   receivables in the area - of payables in the area in which

13   Terry Manufacturing was engaged?

14   A.         Yes.

15   Q.         Would you describe for the court what analysis you

16   performed?

17   A.         Well, there were two things that we did.  The first

18   was I went to a source routinely used by myself in my practice,

19   as well as other CPA's, called Risk Management Association.

20   And from there you can pull the days outstanding for accounts

21   payable and accounts receivable by a particular industry.

22   Q.         All right.  And which industry did you use for Terry

23   Manufacturing?

24   A.         Well, the information is reported by standard

25   industry code, and so we pull the information based on the

1    standard industry code contained on Terry Manufacturing's

2    return but, in addition, we also looked at other similar

3    standard industry codes based on the business that Terry

4    Manufacturing was in to see whether or not there was any

5    significant difference.

6    Q.      Before I ask you the conclusion reached, who is Risk

7    Management?

8    A.      Risk Management is an organization of principally

9    financial institutions. Wachovia is a member. BB&T is a

10   member. And the purpose of that organization is banks report

11   financial information about their customers so that credit

12   departments can use the information in making credit decisions.

13   Q.      Was Risk Management formerly known as Robert Morris

14   & Company?

15   A.      Yes.

16   Q.      All right. So it is a long-established operation; is

17   it not?

18   A.      Yes, it is.

19   Q.      Is it consulted on a routine basis by auditors and

20   CPA's engaged in this sort of practice?

21   A.      Absolutely, yes.

22   Q.      Routinely consulted by banks with respect to credit

23   analysis?

24   A.      Yes, absolutely.

25   Q.      All right. It is my understanding you checked for

1    the industry code in which Terry Manufacturing was active and

2    related industry codes.  What did you conclude with respect to

3    the typical aging for accounts receivable in those industries?

4    A.        The typical aging was thirty-nine to forty-one days.

5    Q.        All right.  And that contrasted with the hundred plus

6    days that the invoices at issue here today were paid by Terry

7    Manufacturing?

8    A.        Yeah, it contrasted to a range of a hundred and

9    thirty-eight to a hundred and eighty-two days.

10   Q.        All right.  And those were the number of days the

11   invoices that were actually paid during the preference period

12   were outstanding?

13   A.        Yes.

14   Q.        All right.  Now, in addition to consulting with the

15   risk management research data, did you do any other tests to

16   attempt to ascertain industry norms in the industries in which

17   Terry Manufacturing was active?

18   A.        Yes.

19   Q.        And what did you do?

20   A.        We went to the Credit Research Foundation which is a

21   similar organization to the Risk Management Association but it

22   is for general business, and we were able to obtain days

23   outstanding for accounts receivable for the textile industry

24   from that source.

25   Q.        All right.  Do you know anything about this group?

1    Is it a recognized authority?

2    A.        It is a recognized group.  Fortune 500 companies are

3    members, as well as my prior firm, Price Waterhouse Coopers, is

4    also a member.

5    Q.        What did that group report with respect to typical

6    aging in the textile industry for accounts receivable and

7    accounts payable?

8    A.        Fifty-five days.  The period of time for this metric

9    is the second quarter of 2003.

10    Q.        So approximately the same time these preference

11    payments or allegedly preference payments were made?

12    A.        Yes.

13           MR. BARRIERE: Your Honor, in connection with this

14    witness' testimony, I would like to mark, offer and introduce

15    as Plaintiff's Exhibit No. 2, Mr. Alexander's expert report

16    that summarizes his findings including his findings with

17    respect to the typical aging in the industry.  And as Exhibit

18    No. 3, the correspondence dated January 9, 2003.

19           MR. ESPY: No objection, Your Honor.

20           THE COURT: Okay.  Exhibits 2 and 3 are admitted.

21           MR. BARRIERE: Thank you, Your Honor.

22    BY MR. BARRIERE:

23    Q.        Mr. Alexander, you told us a moment ago that the

24    invoices paid during the preference period have been

25    outstanding something in the range of a hundred and thirty-two

1    to a hundred and eighty days; is that correct?

2    A.        Yeah, a hundred and thirty-eight to a hundred and

3    eighty-two days, yes.

4    Q.        All right.  Did you find any indicia of any entity in

5    the textile industries other than Terry that were paying that

6    slow?

7    A.        No.

8             MR. BARRIERE: Your Honor, I will likely recall Mr.

9    Alexander as a rebuttal witness but, at this time, I will pass

10   the witness.

11            THE COURT: All right.  Thank you.  Mr. Espy.

12            MR. ESPY: Thank you, Your Honor.

13                         CROSS EXAMINATION

14   BY MR. ESPY:

15   Q.        Mr. Alexander, I am Collier Espy, Jr. representing

16   Bonifay Manufacturing and I will try to limit my testimony

17   right now.

18            You were appointed trustee in July of 2003 for Terry

19   Manufacturing, Inc.?

20   A.        Yes, sir.

21   Q.        And at that time, based on subsequent information,

22   could you tell me what the estimated value of the inventory and

23   receivables were regardless of their being pledged?

24   A.        The reported value or the ultimately determined

25   value?

1    Q.      Both.

2    A.      I can't remember exactly the reported value.  It was

3    somewhere north of thirty million dollars.   It may have

4    approached forty million.

5    Q.      Of what type asset?

6    A.      Inventory and receivables combined.  I don't know the

7    numbers, breaking it out, and the amounts that we determined,

8    there was about eight hundred thousand in accounts receivable,

9    and I can't recall at this moment without grabbing an exhibit

10   the amount of inventory as of July 2003 based on fair value.

11   Q.      Could you give me just your best recollection?

12   A.      Less than five million but I think it was

13   substantially less.  I have a schedule on the table right there

14   if you would like me to look at it and be more precise.

15   Q.      That will be fine if you know where it is.

16           THE WITNESS: May I step down, Your Honor, and get the

17   schedule?

18           THE COURT: Sure.

19           THE WITNESS: Inventory at July 7, 2003, is five

20   hundred and fifty-six thousand dollars.

21   Q.      I am sorry.  That value was at cost, liquidation,

22   resale; do you know –

23   A.      That is the proceeds collected before withholding or

24   deducting any cost of disposal.

25   Q.      And what happened to the proceeds from liquidation?

Alexander - Cross                              27

1    A.          The proceeds from liquidation are sitting in a bank
2    account in the estate.

3    Q.          Has it been acknowledged to be collateral or
4    substitute collateral for any lender or is that still in
5    dispute?

6    A.          There is a collateral dispute over part of the
7    proceeds of the inventory, yes.

8    Q.          In your investigation or review of the records of
9    Terry Manufacturing, do you have any reason to dispute that
10   Bonifay Manufacturing continued to ship goods to Terry
11   Manufacturing during the ninety days up to the date of filing?

12   A.          Because of the condition of records, I have not taken
13   the steps and not sure that it would be productive if I did to
14   verify receipt of goods from Bonifay. So I really just don't
15   know.

16   Q.          All right, sir. Now you indicated that you or your
17   company or someone on your behalf had attempted to rebuild the
18   records of Terry Manufacturing?

19   A.          Yes.

20   Q.          About how far back did that rebuilding go in time
21   from the petition date?

22   A.          We reconstructed balance sheets back through December
23   31, 1998, and then we reconstructed cash basis income
24   statements for the period of the year 2000, 2001, 2002, and the
25   first six months of 2003.

1    Q.       Prior to January of 2003, did you investigate the

2    payment history between Bonifay Manufacturing and Terry

3    Manufacturing for the years before that to any degree?

4    A.       No, I have not.

5    Q.       So as far as the aging of the payables during those

6    years, you have no information about that?

7    A.       I don't possess any information. That doesn't mean

8    that information wasn't produced in this case.

9    Q.       Yes, sir. I just meant that you had found in your

10   rebuilding?

11   A.       In our rebuilding of the records, we found very

12   little information concerning payment patterns of Bonifay. We

13   were working off of bank records and checks.

14   Q.       Thank you, sir. Do you have any information that you

15   have ascertained as to what actually Terry Manufacturing was

16   paying Bonifay Manufacturing for, the nature of its product or

17   what it produced?

18   A.       I have a general understanding.

19   Q.       And what is that, sir?

20   A.       That Bonifay, like other businesses, provided

21   contract sewing services for Terry, and I believe Bonifay

22   principally, if not solely, supplied parts of the McDonald's

23   line of business for Terry Manufacturing.

24   Q.       So, in essence, would it be fair that we agree that

25   the invoices from Bonifay were for labor; that Terry

Price - Direct                    29

1    Manufacturing provided the raw material; Bonifay fabricated the

2    apparel product and shipped it to Terry?  Is that a fair

3    synopsis from -

4    A.        I am not sure I have a good enough understanding of

5    exactly how Bonifay and Terry operated to answer that question

6    fairly.

7              MR. ESPY: May I have just a moment?

8              (Pause)

9              MR. ESPY: Your Honor, I think that is all I have right

10   now.  Thank you, sir.

11             THE COURT: Okay.  Mr. Barriere, anything?

12             MR. BARRIERE: No redirect at this time, Your Honor.

13             THE COURT: Thank you, sir.  You may step down.

14             MR. ESPY: Your Honor, we will go ahead and call Mr.

15   Terry Price.

16             THE COURT: Okay.  I think you need to wait for Mr.

17   Barriere to rest.

18             MR. BARRIERE: He was quick, but I am prepared to rest,

19   Your Honor.

20             THE COURT: Okay.  Now you can call him.

21             MR. ESPY: Okay. I am sorry, sir.

22             (TERRY PRICE, WITNESS, SWORN)

23                        DIRECT EXAMINATION

24   BY MR. ESPY:

25   Q.        Would you state your name for the court and the

Price - Direct                          30

1    record, please, sir?

2    A.        Terry Price.

3    Q.        And, Mr. Price, have you been a principal and officer

4    of Bonifay Manufacturing, Incorporated, for a number of years?

5    A.        Yes, I have.

6    Q.        And through the dates in question in 2003, were you

7    an officer and shareholder?

8    A.        Yes, sir, I was the president.

9    Q.        All right, sir.  Let me go back then.  When was

10   Bonifay Manufacturing, Inc. formed?

11   A.        In 1979.

12   Q.        And who was it formed by?

13   A.        My brother and I.

14   Q.        And what division of shares or ownership?

15   A.        Fifty/fifty.

16   Q.        Who was the president at the time of formation?

17   A.        Myself.

18   Q.        And have you remained in that position through the

19   times in question?

20   A.        Yes, sir.

21   Q.        Have there been any other shareholders of Bonifay

22   Manufacturing except you and your brother?

23   A.        No.

24   Q.        And in your capacity as president, did you have

25   occasion to regularly review the business records of Bonifay

Price - Direct                          31

1    Manufacturing?

2    A.      Yes, that, and all the others.

3    Q.      Okay.  Were you in fact the principal officer in

4    Bonifay Manufacturing who would have had contact with Terry

5    Manufacturing during the late 1990s and early 2000?

6    A.      Yes.

7    Q.      To save some time, could you just briefly review for

8    the court the relationship between Bonifay Manufacturing and

9    Terry Manufacturing, when it began and what it was based on and

10   where it came to?

11   A.      Okay.  We were a sewing contractor and what that

12   basically means is different companies that are in the garment

13   business, in our particular case, shirt business, provides us

14   with fabric, collars, welts, all of the necessary ingredients.

15   We cut it, sew it, and pack it to their specifications, ever

16   how they want it, and we started doing that in '79 and did it

17   up until recently.

18           Terry Manufacturing approached us in 1986 with a

19   program.  At that particular time, it was a Burger King

20   program, and we did that which it ran for several months at a

21   certain number of dozens per week.  We had a real good

22   relationship with them.  They were pleased with the work we did

23   and we were pleased with them.

24           During the course of the time we were making the

25   Burger King shirts, they informed us that they were trying to

Price - Direct                                    32

1    become certified as a McDonald supplier.  At the time, there

2    were only two McDonald suppliers in the U.S. and Terry

3    Manufacturing did become a certified McDonald supplier which

4    made three and then later on one of the others got dropped but

5    Terry remained one.

6           We knew that with McDonald's having the number of

7    restaurants that they did in the United States that that would

8    be a very good customer to have.  So, you know, we continued to

9    produce – after we finished the Burger King, we started making

10   the McDonald shirts.  With them being a new supplier, it

11   started out very small in terms of number of dozens per week

12   because they were the new kid on the block but, as years went

13   by, the dozens increased and increased and increased until

14   Terry was probably the – the McDonald shirts for Terry

15   Manufacturing probably was about thirty to thirty-five percent

16   of our production.

17   Q.      By what time frame, sir?

18   A.      After three or four years it had gotten to that

19   point.

20   Q.      Did Bonifay Manufacturing have any other customers

21   similar to Terry Manufacturing that were principal or primary

22   or major, if I can use that word?

23   A.      Yes.  Our situation has changed over the years.  Like

24   in the first couple of years of our existence, we had one

25   customer, just one.

1    Q.        Who was that, sir?

2    A.        That was Oxford Industries, but we saw that we

3    couldn't keep all of our eggs in one basket, so we got other

4    companies and most of the twenty-five years we were in business

5    we had four or more customers, sometimes as many as six or

6    seven, but most of the time it was four or five.

7              Another company that was for probably twenty-two years

8    was Tulane Shirt Company and, again, started out small with

9    them but they evolved after a few years until they were also

10   about thirty percent of our business.

11   Q.        And, again, by about what time frame would that have

12   been?

13   A.        After probably five years.  It gradually went up and

14   up.  Thirty with Terry and thirty with Tulane approximately.

15   The other forty percent of our work was usually shared between

16   two, three or four companies.

17   Q.        Thank you.  Now, there is no dispute that the

18   invoices supplied by Bonifay Manufacturing state on the bottom

19   "One-half percent finance charge will be applied to all

20   invoices over thirty days old."  Is that correct?

21   A.        That's correct.

22   Q.        Now as the relationship between Bonifay and Terry

23   Manufacturing grew more volume by the early nineties, was that

24   adhered to by Terry Manufacturing; did they pay within thirty

25   days?

1  A.        Terry Manufacturing hardly ever paid within thirty

2  days from 1986 until the last time we got a check.  I won't say

3  never but, if we received during that seventeen-year period, if

4  we received a thousand checks, nine hundred and ninety or more

5  of them were outside thirty days.

6          MR. ESPY: Your Honor, if I may approach the witness.

7          THE COURT: Yes, sir.

8  Q.        I am handing you what has been marked Defendant's

9  Exhibits 1 through 4.  Mr. Price, if I could ask you to just

10  identify Exhibit No. 1 that I have just handed to you,

11  Defendant's Exhibit No. 1?

12  A.        This is a record of the checks received during the

13  ninety-day period prior to the bankruptcy filing.  We have no

14  way of knowing when the check gets honored.  We know when it

15  was received.  So our preparation was based on the date we

16  received the check, and this exhibit lists the check, lists the

17  date we received it, the age range of each of the invoices

18  because a check normally pays for a number of invoices.  In

19  some cases, it might be three.  In some cases, it might be ten

20  or twelve invoices that one particular check covers.

21          When we receive a check, we go back to the oldest

22  invoice and come forward.  That is strictly from a record-

23  keeping standpoint.  That is the way we have always done it.

24  But the fourth column is the age range and the fifth column is

25  the average age and the last column is the median age.

Price - Direct                          35

1    Q.        And did you, yourself, calculate those average age,

2    median age?

3    A.        Yes, sir.

4    Q.        And, again, that is for the ninety-day preference

5    period?

6    A.        Right.

7    Q.        Would you go to Exhibit No. 2, if you would, sir?

8    Could you identify that?

9    A.        This is the exact same information involved in the

10   ninety-day period except this goes back from immediately before

11   the ninety-day period and back until July of 2002 for each

12   check consecutively going backwards and it has the age range of

13   the invoices paid and the average age and the median age.

14   Q.        All right, sir.  Is there an attachment to Exhibit 2?

15   A.        Yes.  This is - for each check it actually lists the

16   check amount, the date received and the invoice number and the

17   date of each invoice that that check paid.

18   Q.        And I believe, sir, attached to that are there

19   payment histories?

20   A.        Yes.

21   Q.        Are those payment histories kept in the normal course

22   of Bonifay Manufacturing's business records?

23   A:        Yes.

24   Q:        And those are payment histories for each of these

25   payments?

Price - Direct                               36

1    A.        Right.

2    Q.        All right, sir.  And Exhibit No. 3, if I could

3    represent to you that those are copies of the actual invoices

4    involved in Exhibit No. 2, does that appear to be an accurate

5    statement?

6    A.        Yes, it is.

7    Q.        So those are the actual invoices we have previously

8    supplied to the trustee?

9    A.        Right.

10   Q.        Could you go to Exhibit No. 4 if you would?

11   A.        Before we do, I might point out - judge, I know you

12   will look at this but I would like to point out that there is

13   the least number of days in the year preceding the ninety-day

14   period, the least number of days is one fifty-eight.    The

15   highest is three hundred and twenty-one.

16   Q.        And so during that year roughly July of '02 up to

17   July, the preference period, Terry Manufacturing was very

18   delinquent in making its payments?

19   A.        Yes, sir.

20   Q.        Okay.   Now, did not Bonifay Manufacturing charge

21   interest for payments beyond ninety days - excuse me - thirty

22   days?

23   A.        Yes, we did.

24   Q:        And did Terry Manufacturing pay interest for late -

25   for these -

1    A.       Yes, they did.

2    Q.       Okay.  Would you go to Exhibit No. 4, if you would,

3    sir, and please identify that for me?

4    A.       This is also an aging report for invoices or for

5    payments made from July 7 of 2001 to June 19 of 2002, which was

6    basically two years before the filing, and it is the same

7    format as the others.  In this particular case, we have got

8    dates from two hundred and eighty-six days to three twenty-one,

9    one seventy-two to one ninety-three, various.  The very best

10   one on this particular year was a ninety-eight day to a hundred

11   and nine day period.

12   Q.       Mr. Price, did you, yourself, calculate each of

13   those?  You looked at those invoices and you calculated those

14   days and the averages yourself?

15   A.       Right.

16   Q.       From the records of Bonifay Manufacturing

17   Corporation?

18   A.       Yes, I did.

19            MR. ESPY: Your Honor, before I lose track at this

20   point, I would like to introduce Exhibits 1 through 4 with any

21   attachments unless there is an objection from Mr. Barriere.

22            MR. BARRIERE: Your Honor, if I could address them

23   serially.  With respect to Exhibit No. 1, my objection would

24   simply be that it is misleading in that the dates are tied to

25   the receipts or deposit of the check as opposed to the date on

Price - Direct                                                    38

1    which the check was negotiated.  So that's –

2              THE COURT: Okay.  We are looking at Exhibit 1 now?

3              MR. BARRIERE: Yes.

4              THE COURT: Okay.  This date received, this was when

5    the  Terry  Manufacturing  check  was  received  by  Bonifay

6    Manufacturing?

7              MR. ESPY: Yes, sir, Your Honor.  That is the only

8    record we have, is –

9              THE COURT: Okay.  And that is what I understood the

10   gentleman had testified to, was that he indicated the date they

11   received it.  I understand that you are going to argue at some

12   point that the important date is the date that it cleared the

13   bank.

14             MR. BARRIERE: That's fine.  As long as that is clear

15   on the record, I don't have any objection with respect to the

16   accuracy of the Supreme Court, as I have pointed out in the

17   pretrial order --

18             THE COURT: Right.

19             MR. BARRIERE:  –  we look at the date of negotiation.

20             THE COURT: Yeah,  I  think  Mr. Price's  testimony  is

21   clear enough on that.

22             MR. ESPY: The only date that we could go from was from

23   when  we  received  it,  so  we  wanted  summaries  that  would

24   adequately have the same – or would have the same basis.

25             THE COURT: I understand.

1            MR. ESPY: All right, sir.

2            THE COURT: Defendant's 1 is admitted.  Okay.

3            MR. BARRIERE:  Exhibit 2, I have no objection to, Your

4       Honor.

5            THE COURT: Defendant's 2 is admitted.

6            MR. BARRIERE: Exhibit 3, I have no objection to.

7            THE COURT: Defendant's 3 is admitted.

8            MR. BARRIERE: And Exhibit 4, all with the same caveat,

9       that the date received is recognized as the date on which they

10      got the check, I have no objection to.

11           THE COURT: Okay.  Then so noted and Defendant's 4 is

12      admitted.

13           MR. ESPY: Thank you, Your Honor.

14      BY MR. ESPY:

15      Q.      Now, Mr. Price, was there an event in the 1990s, a

16      legislative event, that impacted on the apparel industry in

17      this country and Bonifay Manufacturing, in particular?

18      A.      Yes.   The passage of NAFTA almost wiped out,

19      eventually almost wiped out the apparel industry in the United

20      States.  In my particular area, near the Bonifay area, Geneva

21      County, Alabama, I saw six different sewing plants go out of

22      business.   In Slocomb, Alabama, in Chipley, Florida, in

23      Marianna, Florida, all different kind of plants went out of

24      business because the sewing business went to Mexico or Central

25      America.  We were able to hang on and we hung on up until late

1    last year.  We were able to hang on because of long-standing,
2    trusted customers like Terry Manufacturing and Tulane Shirt
3    Company.  And, as I stated earlier, the other companies would
4    flip-flop  around  some.    Other  companies  we  had  long
5    relationships with; it was just that they also went to Mexico
6    and they also went to Central America or wherever, and what
7    they would do is just throw us a bone all along.  But Terry
8    Manufacturing,  Tulane  Shirt  Company,  continued  giving  us
9    business that we could count on getting every week to keep our
10   people working.

11        But what happened in 2001 was we had Terry and Tulane
12   but  some  of  our  other  customers  that  had  been  pretty  big
13   percentage  went  to  Mexico,  forcing  us  to  lay  about  eighty
14   people off, and that was probably one of the biggest layoffs we
15   ever had.  We even got – we were able to get our people signed
16   up for the TIAA, the Trade Relief Act, to give them additional
17   unemployment and trade, education assistance through that act.
18   But it would have almost been a death knell had we not had, for
19   us, had we not had Terry Manufacturing and Tulane.

20   Q.        Is it a fair statement, then, by the end of 1990s
21   that Terry Manufacturing was certainly given greater latitude
22   on paying its invoices?

23   A.        Yes, sir.

24   Q.        But  they  continued  to  pay  invoices  and  Bonifay
25   continued to fabricate and ship during the 1990s?

Price - Direct                    41

1    A.        Right.

2    Q.        On into the 2000s; is that correct?

3    A.        Up until July 2003.  I think we made a shipment on

4    July 1 of 2003.

5    Q.        Just so I am clear again, Bonifay Manufacturing

6    essentially provided a service or labor in taking materials

7    presented by Terry Manufacturing, sewing, fabricating shirts

8    and then invoiced for labor?

9    A.        Right.  We dealt with Roy but, as far as the

10   production, Catina was probably our main contact.  She would

11   send us what we call a cut number and it would contain the

12   style number, the color, the number of pieces they wanted

13   produced by size and they would also send us the marker which

14   is the patterns printed out.  Nowadays it is mostly done by

15   computer.  They also sent us that.  The fabric came to us

16   straight from the mill.  The collars and the welts came to us

17   straight from the mill.  Buttons, labels, so forth, usually

18   came to us from Terry Manufacturing.  They would get those in

19   and ship them on down to us.

20           We would spread the fabric, cut it, sew it, pack it to

21   their specifications and then ship it to them or either their

22   truck - most of the time their truck came and picked it up from

23   us but on a lot of occasions we shipped it by UPS.

24   Q.        All right, sir.  Mr. Price, I will just show you a

25   copy of the letter that is Exhibit 3 that the plaintiff has

1    submitted January 9, 2003, letter, apparently from you to Roy

2    Terry?

3    A.       Right.

4    Q.       And ask you if you can explain the circumstances

5    surrounding that letter and what transpired afterwards, sir,

6    between Bonifay Manufacturing and Terry Manufacturing?

7    A.       Well, up until 2001, we did very well and our cash

8    flow and financial situation was pretty good.  Not pretty good

9    by some people's standards.  Let me throw this in.  My brother

10   and I, just two South Alabama country boys that got into the

11   garment business at an early age.  I started when I was in high

12   school with Van Husen.  When we started Bonifay Manufacturing,

13   I was driving a Volkswagen, and I might have had two thousand

14   dollars in the bank.  The only way we were able to buy the

15   business is we bought it from a fellow that I had worked with

16   for about fifteen years and he financed it.  We didn't put any

17   money down.  We bought the business and he gave us three months

18   before we had to make the first payment, and we worked our buts

19   off and scraped up the money and we went on from there and

20   increased.

21            We was doing pretty good up until we had that eighty

22   person layoff and everything started going to Mexico.  Well,

23   things got a lot worse then.  We did finish 2001 with a profit

24   but it was because of what we had done in the first six months.

25   We lost money the last six months but we had made enough the

1    first six months that we wound up with a profit.

2          Ever since that year, we have had a loss.  We had a
3    loss in '02, we had a loss in '03.  We had a loss in '04.  But
4    at the beginning of '03, after seeing what had happened for the
5    last year and a half, that is when I wrote this letter.  Our
6    cash flow situation was different.  I basically acknowledge in
7    this letter where I say in our present situation we just cannot
8    carry accounts receivables like we have in the past.  In the
9    past, we carried the accounts receivable for them and for
10   Tulane.  We were getting eighteen percent.  That is not a bad
11   return.  And we trusted them and felt like they were going to
12   eventually pay us.  It happens that we were wrong after July of
13   '03 but at the time, you know, we trusted them.  We had known
14   them at this time about sixteen years.  We felt like we were
15   going to get our money, we were getting a good return.

16         But at this point in time, our cash flow was down, we
17   needed the money.  We needed the money in our hands and that is
18   when I wrote the letter.

19   Q.     And what was Terry Manufacturing's response to that
20   as far as payments and how long did it continue?

21   A.     Well, he said that he would make an effort to do this
22   and he did for a period of time.

23   Q.     How long, sir?

24   A.     I guess I would agree with Mr. Alexander.  I am not
25   sure but two months maybe sounds right.  I really don't know.

1    And as they, as Terry Manufacturing did so many times over the

2    seventeen-year period, if we got something going and they got

3    a little bit better time frame, then they would start slipping

4    again, and that is exactly what happened.  But we always

5    shipped.  If they sent us a cut, we always shipped at the end

6    of the week.  We shipped weekly.  We never stopped shipping

7    goods.  Even if we didn't get a check, we always produced what

8    we were supposed to produce and shipped it to them.

9    Q.        And so even when that request for response by Terry

10   Manufacturing fell by the wayside in February or March, Bonifay

11   still continued to ship?

12   A.        Yes, sir.

13   Q.        And other than that letter, did Bonifay Manufacturing

14   thereafter make any threat to cut off Terry Manufacturing or to

15   stop shipping goods if they weren't paid in full or in any

16   other manner not to do business?

17   A.        No.

18             MR. ESPY: Your Honor, may I approach again?

19             THE COURT: Yes, sir.

20   Q.        I will show you what has been marked as Exhibit No.

21   6.  Mr. Price, I will ask you if you can identify Defendant's

22   Exhibit No. 6?

23   A.        Yes.

24   Q.        Okay, sir, if you would identify it.

25   A.        Oh, this is a summary or a listing of the invoices

1    for goods that we shipped from April 8 of '03 until July 7.

2    The last one was actually July 1 of '03, which was immediately

3    before we went on vacation.  I don't have a calendar but that

4    very well may have been a Friday.  I am not sure.  We shipped

5    our last goods out, went on vacation and, when we returned from

6    vacation, we found out that they had filed bankruptcy.

7    Q.      And attached are there either payment histories or

8    invoices as far as supporting those shipments?

9    A.      The copies of the actual invoices for the goods that

10   were shipped are attached.

11   Q.      And those are from the business records of Bonifay

12   Manufacturing?

13   A.      Right.

14   Q.      Has Bonifay Manufacturing been paid for any of those

15   invoices?

16   A.      No.

17   Q.      Now, Bonifay Manufacturing again supplied labor; is

18   that correct?

19   A.      Correct.

20   Q.      In your involvement with Terry Manufacturing did you

21   ever have occasion to look at their catalogs or their brochures

22   or their sales information?

23   A.      Oh, yes.  Normally they would send us a catalog like

24   they send out to the McDonald's Restaurants.  We didn't ever

25   order anything but they would send us a catalog that we could

1    look at, to have on hand.

2    Q.       And knowing your product or what your investment was

3    in Terry Manufacturing's McDonald's goods, what percentage

4    would you say of their sales price was based upon the

5    contribution of Bonifay Manufacturing?

6           MR. BARRIERE: I object to the form of the question,

7    Your Honor.

8           THE COURT: Overruled.  Go ahead and answer it if you

9    understand his question.

10   A.       Well, the catalogs – naturally the prices change as

11   years went along, but the last one I remember seeing had price

12   ranges from twelve to fifteen dollars.  That was their retail

13   price, the McDonald outlets, the best of my recollection.  As

14   these invoices show, our prices to McDonald's was in the thirty

15   dollar, thirty something dollar, and I happen to know what

16   style we made the most of and it was thirty dollars and twenty-

17   five cents.  So roughly twenty-five percent of the retail was

18   our labor.  So for each shirt we produced, if they paid us

19   three dollars, then they was getting twelve or more.

20   Q.       If retail?

21   A.       Right.  Basically this sixty-three thousand dollars

22   should have brought in about two hundred and fifty thousand

23   dollars to Terry Manufacturing.

24   Q.       Again, stipulated retail?

25   A.       Right.

Price - Direct                47

1 Q.        Okay, sir.

2           MR. ESPY: Your Honor, I believe those documents have

3 also been previously provided to Mr. Barriere and we would ask

4 to introduce and admit to evidence Exhibit No. 6 at this time.

5           THE COURT: Okay.  I have got it.

6           MR. ESPY: Exhibit No. 6 would go to the new value

7 that we contend.

8           THE COURT: All right.  Six is admitted.

9           MR. BARRIERE: Your Honor, I have a question with

10 respect to three of these invoices.  It may be a legal issue

11 but three of these invoices are solely for finance charges

12 which I would submit as a matter of law cannot constitute new

13 value, and I would suggest that those three should be deleted.

14 They are invoice number 18979, 19017, 19058, which of course

15 also reduce the total by, my calculations, around forty-two

16 hundred dollars.

17          THE COURT: Okay.  Can you give me those numbers again?

18          MR. BARRIERE: Yes, sir.  The first of those is 18979.

19 It is dated May 3, in the amount of one thousand, five hundred

20 and eighty-three dollars and ninety-four cents.  The second is

21 19017, dated June 3, 2003, in the amount of one thousand, three

22 hundred and fifty-eight dollars and eighty cents.

23          THE COURT: Okay.

24          MR. BARRIERE: And the third and final of those is

25 19058, dated July 1, '03, in the amount of one thousand, two

1    hundred and sixty-four dollars and thirty-one cents.

2              MR. ESPY: Your Honor, we would agree that – I

3    apologize.  Those finance charges would obviously not be new

4    value to the estate, so if those were stricken, we would

5    otherwise ask –

6              THE COURT: Okay.  With that stipulation, then I will

7    admit Defendant's 6.

8              MR. BARRIERE: My back of the envelope math, Your

9    Honor, was four thousand, two hundred and seven dollars and

10   five cents.

11             MR. ESPY: Whatever it is, it is, Your Honor.  Thank

12   you.

13             THE COURT: All right.

14             MR. ESPY: That is all I have of Mr. Price at this

15   time, Your Honor.

16             THE COURT: Okay.  Thank you.  Mr. Barriere.

17             MR. BARRIERE: A few questions, Your Honor.

18                        CROSS EXAMINATION

19   BY MR. BARRIERE:

20   Q.        First, Mr. Price, I was intrigued.  I take it you are

21   now out of business?

22   A.        Well, I am – we have stopped producing.  We stopped

23   producing at the end of December, at Christmas, and since that

24   time I have been trying to finish liquidating the equipment.

25   I still have some equipment to liquidate and that's, as we say

1    in the south, I am in the short rows on that.

2    Q.       Okay.  I am not sure I know what that means, but you

3    are engaged in a non-judicial liquidation proceeding; is that

4    a fair summary?

5    A.       Yes.

6    Q.       All right.  And you have been since December of this

7    year?

8    A.       Yes, sir.

9    Q.       The past year, I am sorry, 2004.  All right.  Now we

10   were looking earlier at, I think, Plaintiff's Exhibit 3, your

11   letter to Mr. Terry of January 9, 2003?

12   A.       Yes, sir.

13   Q.       All right.  The last line of the first page states,

14   and I quote, "Most of our customers are current and stay

15   current but we need all of our customers to be current."  Do

16   you see where I am reading from?

17   A.       Yes, sir.

18   Q.       Have I quoted that accurately?

19   A.       Yes, sir.

20   Q.       That was an accurate statement that you made at that

21   time?

22   A.       Yes, sir, but it didn't say all, it said most.

23   Q.       All right.  I understand, but most of your customers

24   did stay current and Terry was the exception to that?

25   A.       Terry and Tulane.

1    Q.        Terry and Tulane.

2    A.        And occasionally some of the others but, you know,

3    when you are trying to get somebody to pay, you don't want to

4    say, hey, everybody is late but I want you to pay.  You know,

5    you try to emphasize that they are the only one or you try to

6    indicate that they are the only one.

7    Q.        Now I want to focus on Exhibit 6 with you for just a

8    moment.  As I understood the testimony elicited by your

9    counsel, at no time did you condition delivery of goods upon

10   payment of specific invoices; is that correct?

11   A.        I don't think I understood that question.

12   Q.        Let me try again.  Did you ever threaten not to ship

13   unless Terry made a payment to you?

14   A.        No.

15   Q.        You never had an understanding at any time that, in

16   order for you to ship, you had to receive a certain amount of

17   money from Terry Manufacturing?

18   A.        No.

19   Q.        You just assumed that they would pay you as they have

20   in the past at some point?

21   A.        Right.

22   Q.        All right.  And as you sit here today, you have not

23   attempted to correlate dates on which you made shipments with

24   dates on which you got payments?  Payments came in certain

25   dates and shipments went out certain dates, but the two had

1    nothing to do with each other; correct?

2    A.       Correct.

3            THE COURT: Wait a minute.  I hate to but in but I

4    think I understand something and maybe I am wrong, but I

5    thought I understood that basically as Bonifay would make the

6    clothing and then ship it out, they would issue an invoice, and

7    they would have a list of invoices and when a check would come

8    in, they would simply apply it to the oldest open invoices and

9    kept going forward like that?

10           THE WITNESS:  That is correct.

11           THE COURT: Okay.  That's what I had understood -

12           MR. BARRIERE: My point was a little different, Your

13   Honor.

14   BY MR. BARRIERE:

15   Q.       Just so we are clear, what amounts you got from Terry

16   Manufacturing as a payment didn't have anything particularly to

17   do with what you were doing on a given date as far as either

18   producing, providing labor or shipping; correct?

19   A.       Well, I don't think you could say it didn't have

20   anything to do with it.  Let me explain.  If at different times

21   of the year and during this period of time, we were producing

22   less.  You can look at the invoices and tell we were producing

23   less than we were in some of those prior years when you will

24   see invoices for twenty thousand dollars and thirty thousand

25   dollars and, you know, much larger amounts than these, we were

1    doing less dozens.  Well, the amount of payment we would get

2    would depend on how much they owed us, not necessarily what we

3    were producing at the time because we were always in a little

4    bit different time frame because they were - as a matter of

5    fact, going back to this letter, for example, when I was laying

6    out  this  plan  that  they  could  use  to  get  current,  I

7    incorporated into it.  I worked on the numbers and, based on

8    the amount Terry owes Bonifay at present and a weekly average

9    invoicing of two hundred and fifty dozen - see, every week we

10   were going to be invoicing for two hundred and fifty dozen more

11   that would add to what they already owed us.

12   Q.        All right.  With the exception of that two-month

13   period when you were working that way, what you were getting is

14   payments  typically  related  to  work  done  six  months  ago;

15   correct?

16   A.        From ninety days to six months ago, right.

17   Q.        All right.  And what you were actually invoicing

18   during this ninety-day period, that related not to what you did

19   six months ago but what Terry was sending you as a weekly

20   order?

21   A.        Well, this  reflects  what  we  shipped  to  Terry

22   Manufacturing during the dates 4-9 to 7-1-03.

23   Q.        I understand, sir.  And just so the record is clear,

24   I think it already is, the amounts of labor provided and the

25   amounts  invoiced  had  not  anything  to  do  with  what  your

Price - Cross                    53

1    outstanding balances were or what had been billed six months

2    ago but what you were being asked to do by the Terry's at that

3    time?

4    A.        Correct.

5    Q.        All right. And just not to beat the point too hard

6    but so we are all clear, we now have agreed, I believe, that -

7    well, let me just give you an illustration.  We have got a

8    check here in the amount of twenty-two thousand, seven hundred

9    and fifty-eight dollars that cleared on April 9, and I note

10   that on April 9, the same day this check cleared, you billed

11   seven thousand, one hundred and fifty dollars and thirty-four

12   cents; correct?

13   A.        That's correct.

14   Q.        Well, let me finish my question and then you can tell

15   me what I am missing here.  And the first invoice in your

16   package is invoice number 18945 in that amount, seven thousand,

17   one fifty?

18   A.        Right.

19   Q.        So the check that was negotiated on April 9, that had

20   nothing to do with the actual invoices being issued on this

21   date; this just happened to pass at the same time?

22   A.        Well, first of all, as I stated earlier, we knew when

23   we received the check.  We have no idea how long it takes the

24   banking system to run through the hurdles and it get cleared.

25   Until you all produced this 4-9 date, I didn't know what date

1    it cleared.  So when we ship something out, when the cut got

2    ready, it didn't matter what day it was, we shipped it.  If it

3    happened to coincide with a check-clearing date, because we

4    were doing business as we always did for seventeen years, and

5    that was - now, at one point in time we held cuts until Friday

6    and their truck would come on Friday and we might have five

7    cuts, six cuts, eight cuts and we would just hold them until

8    Friday and they would pick them all up.

9         During this period of time, they were actually

10   instructing us as you get a cut ready, ship it UPS.

11   Q.      So as your work was done, it went out the door?

12   A.      Right.

13   Q.      And you would do that and you did that regardless of

14   what money was coming in the door from Terry which was for long

15   past-due invoices?

16   A.      Correct.

17   Q:      All right.

18        MR. BARRIERE: Nothing further, Your Honor.

19        THE COURT: Okay.  Mr. Espy.

20                     REDIRECT EXAMINATION

21   BY MR. ESPY:

22   Q.      So, Mr. Price, again in January of 2003, as president

23   of Bonifay Manufacturing you did ask Terry Manufacturing to

24   make an effort to, quote, get current?

25   A.      Yes, sir.

1    Q.      And was that response by weekly remittances or some

2    regular remittance of funds or how was that begun?

3    A.      Yes, for a period of time we got - well, we always

4    wanted weekly and for a short period of time we got regular

5    payments.

6    Q.      But then that short period of time ran out and it

7    fell back into - in fact, payments would come when they came on

8    old invoices?

9    A.      Right.

10   Q.      But Bonifay would still each week accept orders from

11   Terry Manufacturing in March, April, May, June, July?

12   A.      Right.

13   Q.      Would continue to fabricate and ship those when they

14   were completed?

15   A.      Right.

16   Q.      Without any notice of any intended bankruptcy?

17   A.      I had no knowledge whatsoever.

18           MR. ESPY: Thank you.  That is all.

19           THE COURT: Thank you.  You may step down.

20           MR. ESPY: That is all we have, Your Honor.

21           THE COURT: Okay.  So Bonifay rests.  Anything

22   further, Mr. Barriere, in rebuttal?

23           MR. BARRIERE: No, Your Honor.  I am not sure we are

24   going to recall -

25           THE COURT: I will tell you what.  Why don't we do

56

1    this?  Why don't we take about ten minutes and we will come

2    back out and we will see if anybody has got anything left.

3           MR. BARRIERE: That would be fine, Your Honor.

4           (Recess from 2:49 p.m. until 3:03 p.m.)

5           (CALL TO ORDER)

6           THE COURT: Please be seated.

7           MR. BARRIERE: Your Honor, we will not be calling an

8    additional witness.  We would, however, at this time move for

9    judgment as a matter of law with respect to the two affirmative

10   defenses asserted by Bonifay if I may briefly address that

11   motion.

12          Bonifay  in  the  pretrial  order  has  cited  two

13   affirmative  defenses.   The  first  under  547(c)(1),  the

14   contemporaneous  new  value  exception,  and  the  second  under

15   547(c)(2), the ordinary course of business defense.  Those are

16   the two affirmative defenses set forth in the pretrial order.

17          With respect to the contemporaneous new value defense,

18   Mr. Price  was  quite  candid  that  there  was  no  intention  of

19   contemporaneous exchange, that there was simply a product being

20   shipped and payments coming in and there was no intent the two

21   were in any way to be aligned.  There simply was no showing

22   that  there  was  the  necessary  mental  state.   Indeed  in  its

23   inserts in the pretrial order the court – excuse me – Bonifay

24   represents, and I quote, "Determination of where the parties

25   intended" – of where, I think they meant whether – "the parties

57

1   intended the transaction to be contemporaneous exchange for

2   purposes of 11 USC 547 is a question of fact in each case and

3   there is no objective standard for determining when exchange is

4   in fact substantially contemporaneous, and the court is

5   required to consider all of the surrounding facts."

6        Indeed Mr. Price has told us without hesitation that

7   there was no intention of contemporaneous exchange.

8        Secondly, with respect to the ordinary course defense,

9   I will accept for purposes of our discussion today that Bonifay

10  routinely accepted past-due invoices from Terry Manufacturing.

11  It charged Terry Manufacturing for that. It did, as Mr. Price

12  pointed out, charge eighteen percent. That arguably was their

13  pattern and practice at least at points during the course of

14  that relationship but that, of course, is only half the issue.

15       In *In re AW Associates*, the Eleventh Circuit told us

16  in no uncertain terms that we need to consider not only the

17  relationship and the pattern and practice as between the

18  supplier and the debtor but also for the industry as a whole.

19  Bonifay elected not to present any evidence today with respect

20  to the industry practices, with respect to aging and payment of

21  accounts receivable. Indeed the only evidence before the court

22  is the testimony of Mr. Alexander.

23       So on that basis, Your Honor, I would request that the

24  court hold that those two defenses, affirmative defenses, which

25  of course Bonifay has the burden of proof with respect to both,

58

1 Bonifay failed as a matter of law to meet its burden of proof

2 and ask that they be stricken.

3 THE COURT: Okay. Thank you. Mr. Espy.

4 MR. ESPY: Your Honor, in response we would contend

5 that the trustee has the presumptions as the payments are

6 submitted to you as far as they were within the ninety days,

7 the debtor appears to have been insolvent. We are asking Your

8 Honor to take the time to look at the undisputed testimony

9 before you as to the past relationship between these two

10 businesses over many years. Based on the exhibits, there was

11 a pattern and practice of payments being - invoices continuing

12 and payments being made two hundred to three hundred days late.

13 In our joint pretrial statement, Your Honor, at pages

14 twelve, thirteen and fourteen, we have cited eight to ten

15 cases, Ninth Circuit cases, where Your Honor can look to the

16 length of the time the parties were engaged in the

17 transactions, the amount and form tendered, past practices.

18 Was there any unusual collection activity? We contend there

19 was not. And did we take advantage of the debtor's

20 deteriorating financial condition? We didn't know the debtor's

21 deteriorating financial condition. It was business as usual.

22 We attempted in January and February to try to get

23 Terry Manufacturing to pay quicker. That fell back to the same

24 pattern and practice, but Bonifay continued with its efforts to

25 supply. As orders were received, goods were manufactured and

59

1    goods were shipped.    And we would ask you to take the

2    undisputed testimony, to look at the pattern and practice, look

3    at the exhibits before you, consider the cases and see if you

4    find that there has been proof of an exception that in this

5    instance, between these two parties, there was ordinary course

6    of business.    Admittedly not within maybe industry standard,

7    not within thirty days, maybe not even fifty days but that you

8    consider the relationship of these parties.

9          THE COURT: Okay.    Thank you.    All right.    Well, here

10    is what I am going to do: With respect to the plaintiff's

11    motion for judgment as a matter of law, with respect to the new

12    value defense, I think Mr. Barriere is right.    I think there is

13    a failure of proof on that.    So I am going to grant with

14    respect to the new value.

15          As to the - there is another issue as to the ordinary

16    course.    In my view that is not so clear.    I am going to review

17    the evidence, I am going to read the case law and I will take

18    a look at the ordinary course defense.    So I am going to take

19    that issue under advisement and you can probably expect a

20    decision within about thirty days or so.

21          Thank you all.

22          MR. ESPY: Thank you, Your Honor.

23          MR. BARRIERE: Thank you, Judge.

24          (Off the record at 3:09 p.m.)

C E R T I F I C A T E


      I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____

Patricia Basham, Transcriber

Date: July 6, 2005