IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TERRY MANUFACTURING | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Debtor. | ) | |
| | | |
| IN RE: | ) | |
| | ) | |
| TERRY UNIFORM COMPANY, | ) | |
| LLC, | ) | CIVIL ACTION NO. |
| | ) | 2:05cv730-T |
| Debtor. | ) | (WO) |
| | | |
| J. LESTER ALEXANDER, | ) | |
| III, etc., | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BONIFAY MANUFACTURING, | ) | |
| Inc., | ) | |
| | ) | |
| Appellant. | ) | |

OPINION

Appellant Bonifay Manufacturing, Inc. challenges a

decision of the United States Bankruptcy Court for the

Middle District of Alabama, holding that payments

received by Bonifay from Terry Manufacturing Company, Inc. were preferential under 11 U.S.C.A. § 547(b) and could be avoided by J. Lester Alexander, III, the trustee of Terry's bankruptcy. The court's appellate jurisdiction has been invoked pursuant to 28 U.S.C.A. §§ 158(a) and 157(b)(2)(F). After carefully reviewing the record and the briefs of the parties, the court concludes that the judgment of the bankruptcy court should be affirmed, although the court departs slightly from the bankruptcy court's reasoning.

## I. STANDARD OF REVIEW

This district court "functions as an appellate court in reviewing the bankruptcy court's decision." In re Sublett, 895 F.2d 1381, 1383 (11th Cir. 1990) (citing 28 U.S.C.A. § 158(a)). Accordingly, the bankruptcy court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the

opportunity of the bankruptcy court to judge the credibility of witnesses." Fed. R. Bankr. P. 8013; <u>see also</u> Fed. R. Bankr. P. 7052.

In contrast to the deference given to factual findings, this court examines the bankruptcy court's legal conclusions de novo. <u>In re Club Associates</u>, 951 F.2d 1223, 1228-29 (11th Cir. 1992) (noting that courts hearing appeals from the bankruptcy court may "freely examine[] the applicable principles of law to see if they were properly applied"). Similarly, this court may "freely examine[] the evidence in support of any particular finding to see if it meets the test of substantiality." <u>Id</u>. (internal quotations omitted).

## II. FACTUAL BACKGROUND

Bonifay, a sewing contractor, and Terry began their business relationship in 1986, when Terry hired Bonifay to produce shirts. Since then, Terry has represented anywhere from 30 to 35 % of Bonifay's annual business.

Bonifay relies heavily on Terry for its continued existence in light of the economic downturn in the domestic garment industry in the mid-1990s.[1]

During the course of their relationship, Terry had a history of making its payments late. Although the invoices required payment to be made within 30 days, after which a finance charge would accrue, Terry rarely paid within this 30-day period.[2] From July 23, 2001 to March 24, 2003, the time between the invoice and date of payment ranged anywhere from 98 to 321 days.[3] Terry always paid the finance charge and the principle balance when it made its payment. Bonifay allowed payments so late largely because it depended on Terry for business and because of the long-standing business relationship.[4]

_____

1. Trial transcript, pp. 31-33, 39-40.

2. Id., pp. 33-34.

3.  Defendant's Trial Exhibits 2 & 4.

4. Trial Transcript, pp. 36-37, 40.

On January 9, 2003, however, Bonifay sent Terry a letter setting forth a payment schedule under which Terry "could get 'current' with Bonifay by Mid-May of 2003 by paying $21,500 per week, <u>each and every week, without fail</u>."[5]  The letter continued, "If for any reason a week were missed, then a double amount would need to be paid the next week to meet this timetable."[6]  Terry made these weekly payments for two months, but reverted to paying off specific invoices as it could sometime in March 2003.[7]

Terry filed a voluntary Chapter 11 bankruptcy on July 7, 2003.  In the ninety days immediately preceding the Chapter 11 filing, Terry made six payments to Bonifay, totaling $107,713.15.  These payments were in satisfaction of invoices with dates ranging from October 17, 2002 to January 22, 2003, and were made anywhere from

---

5.    Plaintiff's Trial Exhibit 3 (emphasis in original).

6.    <u>Id</u>.

7.    Trial Transcript, p. 20.

5

138 to 182 days after the invoice date.[8]  The median for outstanding invoices in the garment industry, according to Risk Management Association and Credit Research Foundation, two independent research organizations, is 39 to 41 days and 55 days, respectively.  Bonifay was unique in the garment industry for allowing payments so far beyond the billing date.[9]

The trustee instituted this action against Bonifay to avoid the six payments made during the 90-day preference period.  In an order dated August 3, 2005, the bankruptcy court ruled in favor of the trustee, holding that the payments were inconsistent with ordinary business terms in the garment industry because they were so much later than the industry norm and because Bonifay attempted to put Terry on a payment schedule.  Bonifay filed a timely notice of appeal.

---

8.  Joint Pretrial Statement, Stipulated Facts, ¶¶ 1-8.

9.  Trial Transcript, pp. 21-25.

### III. DISCUSSION

The sole issue on appeal is whether the bankruptcy court gave appropriate weight to the long-standing business relationship between Bonifay and Terry, during which payments were regularly allowed more than 60 days late, in determining whether the six payments were made in the regular course of business, as that term is defined by 11 U.S.C.A. § 547(c)(2).  The parties agree that these six transfers are preferential under § 547(b)[10] unless they fall within the statutory exception created by § 547(c)(2).  Under that provision, a trustee may not avoid a transfer as preferential if the transfer was,

> "(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

---

10.  Section 547(b) provides that a trustee may avoid a transfer to a creditor in satisfaction of a antecedent debt if the transfer was made within 90 days of the debtor's filing for bankruptcy and the creditor benefitted from such payment relative to a dispostion of the debtor's assets under chapter 7 of the Bankruptcy Code.  11 U.S.C.A. § 547(b).

7

> "(B) made in the ordinary course of business or financial affairs of the transferee; and
>
> "(C) made according to ordinary business terms."

11 U.S.C.A. § 547(c)(2). Because this exception operates as an affirmative defense, the creditor bears the burden of proof. 11 U.S.C.A. § 547(g); <u>In re A.W. & Assocs., Inc.</u>, 136 F.3d 1439, 1441 (11th Cir. 1998).

Bonifay has unquestionably satisfied the first two elements of § 547(c)(2). Terry incurred the debts satisfied by these six payments in exchange for sewing work performed by Bonifay, so the debt arose in the ordinary course of business between the debtor and transferee. <u>See</u> 11 U.S.C.A. § 547(c)(2)(A). Bonifay regularly allowed Terry to make payments substantially later than the invoice required, so Bonifay's decision to accept these six payments was in the ordinary course of business of the transferee. <u>See</u> 11 U.S.C.A. § 547(c)(2)(B).

As to the third element, the Eleventh Circuit Court of Appeals has defined "ordinary business terms" as "the <u>range</u> of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage," and stated "that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C [of § 547(c)(2)]." <u>A.W. & Assocs.</u>, 136 F.3d at 1443 (emphasis in original).   In comparing a specific transaction to industry standards, those standards are not a "litmus test by which the legitimacy of a transfer is adjudged," but rather "function as a general backdrop against which the specific transaction" is evaluated.  <u>Id</u>.

"The likelihood of unfair overreaching by a creditor (to the disadvantage of other creditors) is reduced if the parties sustained the same relationship for a substantial time frame prior to the debtor's insolvency." <u>In re Molded Acoustical Products, Inc.</u>, 18 F.3d 217, 225

9

(3d Cir. 1993).  Accordingly, "the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2)."[11]  Id.  However, such a variance is not boundless.  "[T]he parties' longstanding credit terms, although consistent between them, may depart so grossly from what has been established as the pertinent industry's norms that they cannot be seriously considered usual and equitable with respect to the other creditors."  See id. at 226.

A three-step analysis guides courts in determining whether transactions in long-standing business relationships are exempted under § 547(c)(2).  First, the terms between the parties are compared to the range of terms on which firms similar to the transferee provide

_____

11.  In A.W. & Assocs., The Eleventh Circuit cited the Third Circuit's approach approvingly.  136 F.3d at 1443.

credit to firms similar to the debtor.  Molded Acoustical
Products, 18 F.3d at 226-27.  If the terms between the
parties fall outside this industry norm, the court
creates a "customized window surrounding the industry
norm," which takes into account the "length of the
parties' relationship predating the debtor's insolvency."
Id. at 227.  Finally, the court determines "whether the
relationship remained relatively stable leading into and
throughout the insolvency period."  Id.  A relationship
is not stable for these purposes if the terms of payment
during the preference period vary considerably from the
terms throughout the longstanding relationship or if the
creditor has made efforts to accelerate repayment or
otherwise collect the debt.  Id. at 227-28.  If the
transfers in question fit within the customized window
and the relationship was stable leading up to the
insolvency, the transfers are not preferential even if
they vary from the industry norm.  Id. at 226.

In the case at bar, the six payments made by Terry to Bonifay were 138 to 182 days past the invoice date, more than three times later than the industry standard of 39 to 55 days late.  No comparable firms allowed payments anywhere near that late.  Accordingly, these six payments departed substantially from the industry norm.  <u>Accord Molded Acoustical Products</u>, 18 F.3d at 227 (explaining that payments made two times later than the industry norm is a substantial departure).

The nearly 18-year relationship between Terry and Bonifay seems to entitle Bonifay to considerable leeway when crafting a window surrounding the industry norm.  <u>See</u> <u>Molded Acoustical Products</u>, 18 F.3d at 227 (noting that payments accepted 30 % later than the industry norm would likely satisfy § 547(c)(2) given the 18-month relationship between the parties leading up to the debtor's insolvency).  Nonetheless, Bonifay departed from the industry norm by more than 300 %, which could certainly be characterized as a gross departure.

Although no court has defined what constituted a gross departure or considered the outer limit for a reasonable variance under § 547(c)(2), this court need not blaze that trail because Bonifay fails the final step of the inquiry, stability of the relationship.

A court cannot determine if a relationship is stable unless it can discern the baseline or standard pattern of payments before and during the preference period. For example, in <u>Molded Acoustical Products</u>, the court found that a 30-day increase in the average payment period was sufficient to show that the relationship was not stable leading into the debtor's insolvency. 18 F.3d at 227-28. Here, the bankruptcy court concluded that no typical period of payment existed either prior to or during the preference period. This conclusion, based on expert testimony, was not clearly erroneous because prior to the preference period payments were made anywhere from 98 to 321 days after the invoice date and during the preference period the payments were made anywhere from 138 to 162

days after the invoice.  The lack of typicality of payments is itself sufficient to show that the relationship was unstable.  Put another way, a relationship is not stable simply because it is consistently unstable.  Bonifay has simply not met its burden of proof to show stability because the evidence does not support an adequate baseline for the court to assess typicality.

Even if the relationship had been stable in the years preceding Terry's insolvency, the relationship deteriorated when Bonifay attempted to place Terry on a payment schedule on January 9, 2003.  This schedule required weekly payments of $ 21,500, which notably differed from prior practice because the payments were not related to any particular invoices.  Placing a debtor on a payment plan "does not suggest business as usual within the industry but, quite to the contrary, resembles a calculated response to a deteriorating creditor-debtor relationship."  <u>Molded Acoustical Products</u>, 18 F.3d at

14

228.  This payment plan was clearly intended to reduce the outstanding balance to zero by mid-May of 2003. Essentially, Bonifay was engaged in non-judicial collection proceedings against Terry.  Terry made weekly payments through March 2003, though it ceased payments just before the preference period began.  This collection effort extended sufficiently close to the bankruptcy for the court to conclude that this was not a normal debtor-creditor relationship leading up to insolvency.

The court is certainly sympathetic to Bonifay's position because Bonifay's forbearance likely kept Terry out of bankruptcy longer than otherwise would have been the case.  Indeed, the rule allowing variances from the industry norm is premised on the recognition that forbearing creditors of long standing often keep debtors out of bankruptcy.  See Molded Acoustical Products, 18 F.3d at 225.  For that reason, the court agrees with Bonifay that longstanding business relationships can and should alter the court's inquiry under § 547(c)(2) in

15

some cases.  This is simply just not one of those cases because whatever stability existed in the parties' relationship was lost when Bonifay attempted to place Terry on a payment plan which Terry followed until the preference period began.

In sum, the court adopts the analysis set forth in Molded Acoustical Products.  A long-standing business relationship may allow a creditor to depart from the industry norm and still qualify for the safe harbor of § 547(c)(2).  A particularly long-term relationship will allow a creditor even greater leeway from the industry norm.  However, instability in the relationship leading up to the debtor's insolvency, manifested either as inconsistent payment terms or attempts to put the debtor on a payment plan, will prevent the creditor from invoking § 547(c)(2).  Because the court concludes that the relationship between Terry and Bonifay lacked stability, particularly immediately prior to the preference period, these six payments made during the

preference period were not according to ordinary business terms.[12]

An appropriate judgment will be entered affirming the decision of the bankruptcy court.

DONE, this the 9th day of October, 2005.

                            /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE

———————————

12.  The court's reason for reaching this conclusion (lack of stability in the relationship) differs from that of the bankruptcy court in its memorandum decision (Doc. No. 1), dated May 9, 2005.  That court held that the six payments were inconsistent with ordinary terms because they were made well outside the stipulated 30-day invoice billing period and substantially departed from the industry average.  Alexander v. Bonifay Manufacturing Co., 04-3072, slip op. at 7 (Bank. M.D. Ala. May 9, 2005).  The bankruptcy court did not explicitly mention the long-standing business relationship or apply the three-step analysis from Molded Acoustical Products in making this determination.  Although the bankruptcy court also found that Bonifay's attempt to impose the payment plan was not according to ordinary business terms, id. at 7-8, it did not explicitly find that a payment plan suggests a lack of stability in the relationship.